<u>ELLIOTT v FORD</u>
CV 2004 0902 PHX SRB

Exhibit Index: Ford's Motion to Strike Portions of Plaintiff's Statement of
Facts In Response to Ford's Motion for Summary Judgment


A.      Dr. Jarrod Carter's Report.

B.      Excerpts from Geoffrey L. Mahon's Deposition Transcript.

C.      Excerpts from Mike Shepston's Deposition Transcript.

EXHIBIT A



*Principals:*

**Jarrod W Carter, PhD**

**John L Habberstad, PhD, PE**

*Origin Engineering LLC*

*12314 East Broadway Avenue / Spokane, WA 99216 / (509) 926-2566 / Fax: (509) 926-2606*

July 5, 2006

Jill Goldsmith
Bowman and Brooke
2901 N. Central Avenue, Suite 1600
Phoenix, Arizona 85012-2736

# PRELIMINARY RECONSTRUCTION REPORT

## Case:  Elliott v. Ford (05-216)

The following is my preliminary report concerning a two-vehicle rear-end collision that occurred on May 21, 2002 at approximately 8:32 am.  The collision occurred on East Bethany Home Road approximately 155 feet east of its intersection with North 4th in Phoenix, Arizona.

The first vehicle listed in the police report is a 1996 Ford Contour 4-door sedan.  This vehicle was being operated westbound on East Bethany Home Road by Karen Elliott.  Traveling westbound in front of the Contour was a 2001 Chevrolet Blazer 4-door SUV being operated by Ashley Echer (Hardy).

According to the police report the Blazer was stopped in the inside lane when it was struck from behind by the Contour.  The investigating officer estimated an impact speed for the Contour of 35 mph.  Alternatively, Mrs. Hardy stated in her depo that she was traveling at 10 to 15 mph when the impact occurred.  She also testified that the Contour was traveling 40 mph just before impact.

## MATERIALS REVIEWED

Prior to preparing this report the following materials were reviewed:

- Arizona Traffic Accident Report

- 1st Amended Complaint

- Answer of Defendant Autoliv, Inc. to Plaintiff's 1st Amended Complaint and Demand for Jury Trial

- Initial Disclosure Statement

- Rule 16 Scheduling Order

- Initial Disclosure of TRW Vehicle Safety Systems, Inc.

- Plaintiff's Responses to Defendant TRW's Combined Discovery Requests to Plaintiff Karen Elliott

- Plaintiff's Responses to Defendant TRW's 1st Set of Requests for Admission

- Plaintiff's Responses to Defendant Ford Motor Co.'s 1st Set of Interrogatories to Plaintiff

- Defendant Ford Motor Co.'s Response to Plaintiff's Request for Admissions

- Dealer Invoice

- Defendant Ford Motor Co.'s Initial Disclosure Statement

- Separate Answer to Plaintiff's 1st Amended Complaint and Jury Demand of Defendant Ford Motor Co.

- Laser copies of photos from unknown source

- CD containing Vehicle Inspection Photos rolls A-E taken by Carr Engineering - 5/6/2005

- 2 Video tapes of Vehicle Inspection on 5/6/05

- Carr Engineering Vehicle Inspection Notes

- Amended Scheduling Order

- CD Titled, "1996 Ford Contour 7/14/05 Phoenix AZ: DVD Video, JPEG and PDF photos" from Collision Protection Sciences LLC

- Plaintiff's 2nd Supplemental Disclosure Statement

- Plaintiff's 3rd Supplemental Disclosure Statement

- First Report from Canyon State Adjusters, Ltd.

- CD containing Employment Records for Karen Elliott from Plaintiff's 3rd Supplemental Disclosure Statement

- CD containing Expert Reports from Plaintiff's 2nd Supplemental Disclosure Statement

- Medical Records of Karen Elliott from John C. Lincoln Hospital

- Records from Shamrock Towing

- Laser copies of Vehicle Photos taken by Investigation Specialists, LTD – 8/25/05

- Records from City of Phoenix Fire Department

- Plaintiff's 5th Supplemental Disclosure Statement

- Plaintiff's 4th Supplemental Disclosure Statement

- Plaintiff's 6th Supplemental Disclosure Statement

- Laser copies of photos of vehicle removal from Dan Burr – 10/24/05

- DVD of vehicle inspection by Mike Scott, PhD – 10/31/05

- Traffic Citation for Driver of Ford Contour

- Duplicate copy of traffic citation for driver of Ford Contour

- Exam records of Karen Elliott from Pamela Lund, MD – 1/2/01

- Plaintiff's 8th Supplemental Disclosure Statement

- Plaintiff's Responses to Defendant Ford Motor Co.'s 2nd Requests for Admission

- Plaintiff's Response to Defendant Ford Motor Co.'s 2nd Set of Interrogatories

- Plaintiff's 9th Supplemental Disclosure Statement

- Invoices from Courtesy Chevrolet

- Plaintiff's 10th Supplemental Disclosure Statement

- Report of Michael Shepston – 4/13/2006

- Report of Robert Anderson – 4/13/2006

- Plaintiff's 11th Supplemental Disclosure Statement (Trial Witnesses)

- CD titled, Robert D. Anderson '96 Ford Contour

- Plaintiff's 12th Supplemental Disclosure Statement

- Additional documents – Bates No. ELL002334 through ELL002363

- Duplicate copy of CarFax reports for both Blazer and Contour

- CD titled, Photos of Karen Elliott Photos of Vehicle Produced by Plaintiff

- Accident report from prior accident the Blazer was in

- CD containing Report & Photos from Geoffrey Mahon (photos not in binders)

- Plaintiff's 14th Supplemental Disclosure Statement

- Plaintiff's 13th Supplemental Disclosure Statement

- CD containing Exemplar and Surrogate inspection photos taken by Mike Scott – 4/21/06

- CD containing vehicle inspection photos rolls F-G from Carr Engineering – 5/25/06

- CD titled, Collision Protection Sciences 1996 Ford Contour 7/17/05 by Gregory Miller

- Carr Engineering Vehicle Inspection Notes – 5/25/06

- Color photos of the subject Blazer taken by Canyon State Adjusters the day after the subject incident

- State Farm insurance records

- Crash test materials ELLIOTT 017399, ELLIOTT 017400, ELLIOTT 023415, F 96033, F 96034, F 96181, F 96242, F 96243 ELLIOTT 023417

- Depositions of Leslie Edison, Karen Elliott, Alan Gordon, Ashley Hardy, Glenn Larson, Gary Mackman (Vols I & II), Dean Pedrotti, Errol Sweet, Steven Wiener, Wiley Williams

- Expert depositions of Robert Anderson, Geoffrey Mahon, Michael Shepston

- Deposition exhibits for Geoffrey Mahon, Robert Anderson, and Michael Shepston

# WORK COMPLETED

Prior to preparing this report the following work was completed:

- Inspected photographed and measured subject 1996 Ford Contour 4-door sedan (VIN – 3FALP6537TM116320) on November 18, 2005

- Inspected, photographed, measured, and removed front fascia from subject Contour on May 25, 2006

- Inspected, photographed, and measured an exemplar 1995 Ford Contour 4-door sedan (VIN – 1FALP6538SK205951)

- Inspected, photographed, and measured subject 2001 Chevrolet Blazer 4-door (VIN – 1GNCS13W912223258) on November 18, 2005 and again on May 25, 2006

- Inspected, photographed, and measured an exemplar 2000 Chevrolet Blazer 4-door (VIN -- 1GNDT13W4Y2164941)

- Inspected and photographed the accident scene November 18, 2005

- Conducted two crash tests, one on June 27, 2006 and a second one on June 30, 2006

# DISCUSSION

During my first inspection of the Ford Contour I found little if any damage to the front bumper as measured along the polymer front bumper cover. However, I did observe damage to the upper radiator support, suggesting that the impact was more severe than what was measurable on the front bumper cover.

Following, my first inspection I did request, and was granted permission, to remove the front bumper cover so that an inspection of the underlying bumper structure could be made. With the cover removed I found that the Contour was equipped with an energy absorbing polymer bumper beam. The bumper beam had sustained observable and measurable damage.

In general the following damage was noted to the front of the Contour:

- Stress cracking and buckling of the left corner of the polymer front bumper cover

- Distinct impressions in the leading edge of the bumper cover produced by the rear bumper of the Blazer

- Various cuts and scrapes of the front bumper cover

- Rearward deformation across the balance of the polymer front bumper beam

- Buckling/bending of the front bumper beam at the mounting points

- Fracture of the front bumper beam near the left end in the area of the left-front mounting point

- Fracture of the grill and the underlying support structure for the grill and front headlights

- Rearward deformation and bending of the upper radiator support

- Localized contact damage to the leading edge of the hood

- General induced bending of the hood

Following, my second inspection I requested that Exponent be tasked with digitizing the vehicle so that the damage, particularly on the bumper beam and upper radiator support, could be accurately measured. The results of comparing the digitization data from subject Ford Contour with an exemplar revealed that the bumper beam and radiator support sustained, on average, 0.55 inches and 0.56 inches of crush, respectively.

My analysis of this particular incident is based upon crash testing that was conducted at my direction. The testing was conducted at Exponent's Test and Engineering Center in Phoenix, Arizona. The purpose of the testing was to closely approximate the damage to the accident Contour on an undamaged Contour. This was done by first running a test where an exemplar 1996 Ford Contour traveling at approximately 9 mph rear-ended a stationary exemplar 2001 Chevrolet Blazer, consistent with Mr. Shepston's opinion on closure speed.

The test configuration was such that the centerline of the Blazer was offset 12 inches to the left of the Contour's centerline at impact. Also, the front end of the test Contour was lowered in order to produce witness marks on the front fascia consistent with those noted on the subject Contour.

After the test the Contour was digitized so that the crush produced could be compared to the subject vehicle. The Blazer was also digitized.

The actual test speed was 8.8 mph. The Contour underwent a speed change of 6.9 mph. The Blazer sustained a speed change of 5.5 mph. The computed coefficient of restitution was 0.41. The crush damage sustained by the test Contour was 0.16 inches on average. Since, the damage in this test was substantially less than that observed on the subject Contour a second test was undertaken to more closely approximate the accident damage.

The second test was configured similarly to the first test, except for the closure speed. Computations based on the data from the first test suggested a closure speed for the second test of 15 mph. The test was actually conducted at 15.2 mph. The Contour sustained a speed change of 10.8 mph. The Blazer sustained a speed change of 8.4 mph. The computed coefficient of restitution was 0.26. The average crush damage sustained by the Contour in test 2 was 0.42 inches, compared to 0.55 inches on the subject Contour. The upper radiator support visually appeared to be deformed, but not to the extent that was observed on the subject vehicle. Furthermore, the general appearance of the damage to the bumper beam, particularly in the area of the mounts, was similar to what I observed on the subject Contour. Thus, the damage sustained by the Contour in test 2 was similar to, but less than, the damage observed in the subject Contour.

The close approximation of the second test to the actual crash was further validated by comparing the damage to the subject Blazer, as highlighted in the Canyon State Adjuster photos and in the deposition of Ashley Hardy (Echer), to the damage sustained by the Blazer in each test. Particular attention was paid to significant frame damage documented/described by both sources along with Mrs. Hardy's representation that the rear doors could not be opened after the collision.

Following test 2, frame damage (bending) similar to that depicted in the Canyon State photos was noted on the right frame rail in the area of the right-rear kick-up. The left frame also sustained bending damage similar to that noted on the right frame rail. Also, the right-rear door was misaligned and would not properly close, suggesting slightly less damage than what was testified to by Mrs. Hardy. It is important to note that none of this damage was observed on the Blazer after test 1.

For both tests the airbag system in the Contour was active, but the airbags did not deploy in either test.

Using the data from the two tests that were conducted I was able to estimate the likely closure speed and change and velocity that would best approximate the conditions in the subject crash.

- At the time of the crash the closure speed between the Contour and the Blazer was approximately 18.5 mph

- The speed change sustained by the Contour as a result of the crash was in the range of 12.5 to 13.1 mph

- If the Blazer was actually moving at 10 to 15 mph at the time of the crash, per the testimony of Mrs. Hardy (Echer), then the Contour was traveling at 28.5 to 33.5 mph

I have thoroughly reviewed both the report and deposition of Michael Shepston in this matter. My understanding of his reconstruction can be represented with the following bullet items:

- Blazer stopped at impact

- No measurable damage to Contour

- Velocity change for the Contour was less than or equal to 5 mph because there was no measurable crush

- Contour traveling 9 mph at impact

I cannot find any basis for Mr. Shepston's opinions regarding impact speed or velocity change in his report, deposition, or deposition exhibits. It appears that he simply believes that because there was little or no damage the impact speed and velocity change are 9 and 5 mph, respectively. However, considering the results of test 1, which was conducted at the closure speed suggested by Mr. Shepston, it is clear that his opinions regarding closure speed and speed change are incorrect. Indeed, the actual closure speed and speed change in the subject crash are likely to be at least twice as high as what Mr. Shepston opines.

The opinions expressed in this report are given to a reasonable degree of engineering probability and are based on the information currently available and the work completed thus far. Should additional information become available I reserve the right to review the information, perform additional work, and amend/supplement this report as necessary.

Jarrod Carter

EXHIBIT B

1          UNITED STATES DISTRICT COURT
              DISTRICT OF ARIZONA

2

3  KAREN ELLIOTT, an individual,

4          Plaintiff(s),

5      vs.

6  FORD MOTOR COMPANY, a Delaware
   Corporation, TRW HOLDINGS

7  CORP., a Delaware Corporation,
   and AUTO LIV, INC., a foreign

8  corporation,

9          Defendant(s).

10 _____

11   DEPOSITION UNDER ORAL EXAMINATION OF

12        GEOFFREY L. MAHON, P.E.

13        DATE:  May 17, 2006

14    REPORTED BY:  MICHAEL FRIEDMAN, CSR

15

16

17

18

19

20

21

22       ESQUIRE DEPOSITION SERVICES
          90 Woodbridge Center Drive

23              Suite 340
         Woodbridge, New Jersey  07095

24     (732) 283-1060 or (800) 247-8366

25 JOB  #  616222

G. L. Mahon, P.E.

1    correct that the 1996 Ford Contour as a

2    multipoint electromechanical system -- does

3    the air bag system in the 1996 Fort Contour

4    contain a multipoint electromechanical sensor

5    system?

6        A    Yes, it does.

7            Q    And your opinion in this case

8    is that the sensor system in the 1996 Ford

9    Contour is defective because it contains a

10   dwell enhancer; am I correct?

11       A    That is correct.

12           Q    Have you read the deposition

13   of Ms. Elliott?

14       A    Yes, I have.  I'm sure I have.

15           Q    You have your deposition with

16   you?

17       A    I do.  That will take me a minute.

18           (Witness reviewing.)

19           I stand corrected.  I did not

20   review the dep of Ms. Elliott.

21           Q    I see that you appear to be

22   going through some handwritten notes; is that

23   correct?

24       A    That is correct.

25           MS. GOLDSMITH:  I would like to

G. L. Mahon, P.E.

1   the reason the air bag deployed under the
2   circumstances of this accident is because
3   this air bag system included a dwell
4   enhancer?

5        A     Yes.

6             Q     What is the basis for that?

7        A     The basis for my opinion that
8   that's why it deployed?  Is that the
9   question?  I want to understand the question.

10            Q     Sure.  What is the basis for
11  your opinion that the reason the air bag
12  deployed under the circumstances of this
13  accident was the addition of the dwell
14  enhancer?

15       A     Okay, fine.  The impact was a,
16  first of all, very minor impact, and the
17  velocity change of the vehicle was very low,
18  so that what we had was a localized impact
19  near the right front crush zone sensor which
20  would have been a short, sharp impact, and
21  short, sharp impacts are quite similar to the
22  things that we see in deer hits, for example.

23            And the buildup of the velocity
24  change of the vehicle in such an impact in
25  the passenger compartment occurs much later

G. L. Mahon, P.E.

1    than the velocity change at the sensor, so

2    while you might, in fact, get the closure of

3    a safing sensor eventually, you don't get it

4    simultaneously with the front discriminating

5    sensor.

6         And this is been demonstrated in

7    numerous 50-mile-an-hour simulated deer

8    impacts performed by General Motors over the

9    years which I have analyzed, and, in fact, is

10   a test that the Ford Motor Company does not

11   run, and therefore, they don't have the data.

12        Q    Any other basis for that

13   opinion?

14        A    Knowledge of how the dwell enhancer

15   works.  Of course, it's necessary to

16   understand what we mean by that, not

17   knowledge of how the sensors work.  Obviously

18   you need to understand that as well, but I

19   think that was implied in what I said, but in

20   case it wasn't, I'm making sure that's part

21   of it.

22        Q    Any other basis for your

23   opinion?

24        A    I think that will do for the

25   moment.

G. L. Mahon, P.E.

1      A      Let's begin with the drawings,

2   because I don't know what drawings you're

3   talking about.

4          There may be a drawing for a

5   Shotski diode somewhere, which I believe is

6   the actual device in question, but again, I

7   can't sit here and tell you I know what he

8   did or did not do.  It wasn't my turn to

9   watch him.

10         Q      Okay.  Anyone else besides

11  Chris Caruso who has said that the dwell

12  enhancer is a bad idea?

13      A      Well, I believe there were others.

14  I'm not sure that I can name them and be

15  absolutely positive they said that.

16         Q      Your report does not reflect

17  any opinions of manufacturing defect,

18  correct?

19      A      That's correct.

20         Q      You have no opinions that

21  the -- that the air bag system or any

22  component thereof in the 1996 Ford Contour

23  has a defect in manufacturing?

24      A      That's correct.

25         Q      You have no opinions that the

G. L. Mahon, P.E.

1   sensors in the 1996 Ford Contour in

2   Ms. Elliott's vehicle cannot meet Ford's

3   specifications?

4       A     I replied earlier that I believe

5   they did.

6             Q     I think that was off the

7   record when we spoke to Mr. Shumway.  Let me

8   put this on the record.

9             You would agree that the

10  safing sensors and the discriminating sensors

11  in Ms. Elliott's 1996 Contour passed all of

12  the technology tests regularly performed on

13  its ball in tube discriminating and safing

14  sensors at the time those sensors came off

15  the Breed Technologies assembly lines and

16  would pass those same Breed technology tests

17  at this time?

18      A     First of all, there's no question

19  they passed the tests or they wouldn't be in

20  the car, and I believe they still would pass

21  the tests.

22            Q     You hold that belief to a

23  reasonable degree of engineering probability?

24      A     Yes, I do.

25            Q     The tests performed by Breed

G. L. Mahon, P.E.

1    don't think was contributory in this case.

2    This is not to say that I don't think they're

3    inadequate or whatever, but in this case they

4    were not contributory.

5              Q      What does that mean?

6         A      If we were to place the sensors in

7    an area where I was happy with their

8    placement and we still had a dwell enhancer,

9    I think we would have the same result; so,

10   therefore, moving the sensor or not doesn't

11   affect the deployment.

12             Q      There is nothing that

13   prevented you from reflecting your criticism

14   about the placement of the sensors in the

15   1996 Ford Contour in this report we marked as

16   Exhibit 3, correct?

17        A      There was nothing prohibiting or

18   preventing me, but it didn't seem relevant in

19   this case.

20             Q      The placement of the sensors

21   in this vehicle are not relevant to any

22   opinions of defect that you have, correct?

23        A      In this case.

24             Q      Am I correct about that?

25        A      In this case, you're correct.

G. L. Mahon, P.E.

1      A      That's correct.

2           MS. GOLDSMITH:  To put on the

3      record to both Mr. Shumway and to you, I

4      will take the position that any opinions

5      that you now have that don't appear in

6      your report should be stricken, because

7      your report was due with final opinions

8      on or about the date you wrote it.  So

9      all I'm trying to do is just to speed

10     things along so we can focus on the

11     issues in this case, which is to rule

12     out those things that are not at issue,

13     just to be up front with you.

14          MR. SHUMWAY:  For the record, if

15     your position ends up being that in

16     order to put on evidence of an

17     alternative safer design at the trial

18     requires having a different placement

19     that Mr. Mahon approves of the

20     discriminating sensors, we're going to

21     respond with a rebuttal report that

22     addresses that issue.

23          What Mr. Mahon's opinion is that

24     this system is defective with a dwell

25     enhancer, getting rid of it is the

G. L. Mahon, P.E.

1          alternative design that solves this

2          problem.   There is redesign --

3          engineering redesign that would go with

4          designing the replacement system, and if

5          you're position is that we haven't met

6          our alternative design report

7          requirements with what he has said, if

8          that's what your experts say, we will do

9          a rebuttal report.

10              THE WITNESS:  I'll leave it alone.

11              MS. GOLDSMITH:  This is between

12          lawyers.

13              Q     Breed and you never told Ford

14     that the location of the sensors in the

15     bracketry were put in the wrong spots on this

16     model vehicle, correct?

17        A     Well, first of all, I'm not sure

18     that I can speak for everyone at Breed.

19     However, the way the sensor calibration

20     process works, the OEM, namely Ford, chooses

21     candidate locations which are instrumented.

22     They then run a matrix of crashes that say,

23     "Give us a sensor system which meets the

24     requirements," such as fire at such and such

25     or don't fire the air bag, and Breed runs a

G. L. Mahon, P.E.

1    number to find what the number velocity

2    required to just close the sensor is, and

3    that's how the sensor naming works.

4                 Q      Okay.

5         A      Probably more than you ever wanted

6    to know.

7                 Q      You're not going to express

8    opinions about the aggresivity of the air

9    bag, correct?

10        A      That's correct.

11                Q      You're not going to say the

12   air bag in the 1996 Ford Contour is overly

13   aggressive, correct?

14        A      I'm not going to discuss

15   aggresivity at all.

16                Q      Your report does not reflect

17   any opinion that the air bag deployed late in

18   this accident, correct?

19        A      That's correct.

20                Q      You're not going to come to

21   court and say, "this air bag is defective

22   because it deployed late in this accident,"

23   correct?

24        A      Subject to any information which

25   arises from subsequent tests performed in the

G. L. Mahon, P.E.

1    next few days or information provided by

2    Ford's experts, that is correct.

3              Q    Is there testing going on in

4    the next few days?

5         A    I believe there is the removal of

6    the bumper facia and inspection and

7    measurement.  Maybe "testing" is the wrong

8    term, but information coming in the next

9    several days.

10             Q    As you sit here today, you're

11   not going to come to court and say that the

12   air bag is defective because it deployed

13   late?

14        A    As I sit here today, that's

15   correct.

16             Q    Your report, Exhibit 3, does

17   not reflect any opinion that Ford should have

18   done additional or different testing on the

19   air bag system that is the 1996 Ford Contour,

20   correct?

21        A    It's not listed in the opinion

22   section.  In the bottom of the report, it's

23   critical, the fact Ford didn't run deer

24   tests, I'm sure.

25             Q    You have -- your report does

G. L. Mahon, P.E.

1  enhancer was removed, correct?

2      A     For this case, that is correct.

3            Q     Okay.  You're not going to

4  come to court and say that the design of the

5  discriminating sensors and the safing sensors

6  is defective, correct?

7      A     I'm not sure I know what you mean

8  by the question.  When you say "design," are

9  you talking about the components themselves,

10  the sensor componentry?

11           Q     That's correct.  You're not

12  going to come to court and criticize the

13  sensor componentry?

14      A     That is correct.

15           Q     You have not attempted a

16  reconstruction of this accident; you're

17  relying on Shepston?

18      A     That's correct.

19           Q     You have not attempted to

20  independently determine how the vehicles were

21  aligned with each other at impact?

22      A     Correct.

23           Q     Do you know whether the delta

24  V Mr. Shepston put in his report includes

25  rebound?

G. L. Mahon, P.E.

1   heard in the past, and you don't get that

2   information.  In fact, the time to stop is a

3   constant so it all holds together, and that

4   is independent of the incoming velocity for

5   the frontal barrier.

6            Furthermore, for my crash type,

7   that is the center lying pole or a 30-degree

8   angle barrier, as long as it's perfectly

9   consistent over a wide change, the duration

10  will be constant but not necessarily the same

11  as a frontal barrier.

12           Q    You're not going to come to

13  court and criticize the fire and no-fire

14  thresholds that are set forth in Ford

15  specifications, correct?

16      A    That's correct.

17           Q    I asked you whether -- strike

18  that.

19      A    I might wince at the

20  eight-mile-an-hour, but I won't come in and

21  jump up and down.

22           Q    Can we go ahead and cross that

23  out as an area that you're not going to

24  address as a defect?

25      A    Sure.

G. L. Mahon, P.E.

```
 1    the 1996 Ford Contour air bag systems?
 2              MR. SHUMWAY:  Objection to form.
 3        A    Of course I would disagree with you
 4    on that.
 5              Q    For the reasons that you
 6    already told me?
 7        A    If you did the deer impact testing,
 8    you couldn't pass it with the dwell enhancer.
 9    If you didn't have the dwell enhancer, you
10    would not have a deployment in this case so,
11    yes, for the reasons that I already
12    mentioned.
13              Q    Would you agree with me that
14    the air bag system passes the Federal Motor
15    Vehicle Safety Standards under 208?
16        A    I would agree that the vehicle
17    passes FMBSS 208.  I don't know that FMBSS
18    208 is limited to the air bag itself.
19              Q    So you're not going to come to
20    court and say that the 1996 Ford Contour does
21    not comply with FMBSS 208?
22        A    Couldn't be sold if it didn't.  It
23    was already certified that it passed.
24    There's no way for me to say that it didn't.
25              Q    You have no evidence that the
```

G. L. Mahon, P.E.

1   1996 Ford Contour does not pass Federal Motor
2   Vehicle Safety Standards 208?
3        A    That is correct.
4            Q    In fact, you have no evidence
5   that the 1996 Ford Contour doesn't pass all
6   of the FMBSS requirements, correct?
7            MR. SHUMWAY:  Objection, form.
8            Q    Would you agree with me that
9   the 1996 Ford Contour passes all of the
10  applicable Ford motor vehicle safety
11  standards?
12           MR. SHUMWAY:  Objection, form.
13      A    I believe the question should be
14  Federal Motor Vehicle Safety Standards.
15           Q    Okay.  I thought I said
16  Federal.
17      A    Would you agree with me that the
18  1996 Ford Contour passes all of the Federal
19  Motor Vehicle Safety Standards?
20           MR. SHUMWAY:  Objection, form,
21      foundation.
22      A    Had to, or it couldn't have been
23  sold in the first place.  So, yes, it did.
24           Q    Looking at your report we
25  marked as Exhibit 3, you note that throughout

G. L. Mahon, P.E.

1    it there is different-sized fonts, correct?

2        A    Well, I will note it when I get a

3    chance to examine it.

4             Q    Let me draw you to one

5    example.  Going to page 3, do you see in the

6    bottom paragraph the font is in two different

7    sizes?

8        A    I don't think so.

9             Q    You don't see that the word

10   "angle barrier crashes" and the remaining

11   part of that page is in a smaller type than

12   the rest of the page?

13       A    Just where is angle barrier crash?

14            Q    It's toward the bottom, about

15   the fifth line down.

16       A    No.

17            Q    Okay.  Well, the report that

18   we have has different-sized fonts, so perhaps

19   the one you have in front of you -- did you

20   do like a cut and paste from different

21   reports when you prepared this report?

22       A    For the discussion section of

23   reports, I -- I sometimes do that, yes.

24            Q    And would you agree with me

25   that you did a cut and paste in a discussion

G. L. Mahon, P.E.

1    section of this report that we marked as

2    Exhibit 3?

3         A     Not necessarily cut and paste.

4    Probably more like cut and create.

5              If you go back to the beginning of

6    this paragraph, which begins, "The high and

7    low speed barrier tests are very useful,"

8    et cetera, I think you will find a paragraph

9    beginning with that verbiage in almost every

10   report I have ever written.  However, the

11   minimum impact speed of a Ford Contour would

12   only appear in reports that I have written

13   for Ford Contours and would be unique to this

14   report.

15             Q     What I would like you to do is

16   to underline those portions of the discussion

17   that are unique to that report.

18        A     That will take some time.

19             Q     Perhaps we can do that at the

20   next break.

21        A     That will take some time even at

22   the next break, because I'm not sure I'm

23   going to remember what I wrote for this

24   report or not, and I'm not sure that I want

25   to create an exhibit for trial without having

G. L. Mahon, P.E.

1    proper time to cogitate for each and every

2    line in here.

3              Q    Let's go this way:  First

4    paragraph on page 3 begins with, "Air bags

5    are designed to deploy."

6         A    I see that.

7              Q    Everything in this paragraph

8    is what you write for all of your reports?

9         A    For the most part, yes.

10             Q    The next paragraph, "It is

11   important to note that the regulatory

12   limits."  Do you see that paragraph?

13        A    I do.

14             Q    That is also something that

15   appears in most of your reports involving

16   Ford motor vehicle cases?

17        A    Yes.  It's modified depending on

18   the year and the manufacturer, but the

19   essence of it is the same.

20             Q    The next one that says, "The

21   gray zone is required to allow for the

22   stack-up of tolerance," do you see that?

23        A    I do.

24             Q    That's in all of your reports?

25        A    That's in most of my reports, yes.

G. L. Mahon, P.E.

1    Q    You said that, "The high and
2  low-speed barrier tests are very useful from
3  an engineering standpoint because they are
4  very repeatable."  That's also in all of your
5  reports?
6    A    That sentence is, and this is a
7  paragraph that gets edited in various places
8  from time to time.
9    Q    The portion of my copy of your
10  report that has a smaller typed font begins
11  with, "Angled barrier crashes," and it
12  remains in a smaller font that continues to
13  page 4.
14    Assuming that different-sized
15  font, would you agree that's the portion that
16  you made for this report?
17    A    I'm not sure totally, because there
18  may be other places where there was editing.
19  If you edit in the middle of the paragraph,
20  you get whatever font is in that paragraph.
21    So if you cut and paste and add it
22  to the middle, you get that font anyway, so
23  there's no guarantee there's no changes in
24  the middle of the paragraph from some other
25  report that I may have cut it from.

G. L. Mahon, P.E.

1          Q      There may be cut and paste --
2    I have some portions of the discussion
3    section that has a smaller font than the
4    rest, but I can't look to that and say that's
5    something you did for this case and the rest
6    is all cut and paste?
7          A      That's correct.
8          Q      You have on page 4 this
9    reference to bag slap?
10         A      Yes.
11         Q      Do you have an opinion as to
12   whether there was a bag slap here in this
13   accident?
14         A      Well, in fact, I'm not doing the
15   biomechanics.  I believe there was.
16         Q      What's the basis for that
17   opinion?
18         A      The kinds of injuries that we have
19   are consistent with a high-velocity
20   interaction of the tissue and the bag.
21         Q      Any other basis for that
22   opinion?
23         A      That's plenty.
24         Q      Have you done any computer
25   simulations of this accident?

G. L. Mahon, P.E.

1    all of the bases for your opinion that an air

2    bag system that contains a dwell enhancer is

3    defective and unreasonably dangerous.

4        A     The dwell enhancer defeats the very

5    purpose of a safing sensor by artificially

6    extending the dwell of a discriminating

7    sensor for a very long time.

8            As a result, any impact of a

9    localized nature which would give a

10   short-term closure to a crush zone

11   discriminating sensor and a later closure to

12   a safing sensor will result in an air bag

13   deployment in an event that is less severe

14   than the must-not-deploy threshold.

15           The deployment of an air bag when

16   it's completely unnecessary and subjecting

17   the occupant to air bag-induced injuries

18   unnecessarily is, in my opinion, a defect.

19           Q     What's your understanding of

20   the definition of defect?

21       A     A defect is a -- we're talking

22   about -- let's be clear.  You're talking

23   about a design defect as opposed to a

24   manufacturing defect, right?

25           Q     You tell me.  This is a design

G. L. Mahon, P.E.

1    defect case?

2        A     That is correct.  I said this is

3    not a manufacturing defect case, so the

4    question that I'm answering is on the

5    understanding we're talking about a design

6    defect.

7              Q     Before we get to that, have I

8    heard from you all of the bases for your

9    opinion that the 1996 Ford Contour is --

10   strike that.

11                   Have I heard all of the bases

12   that the air bag system in the 1996 Ford

13   Contour has a design defect?

14       A     The question that you asked me was

15   vehicles that include a dwell enhancer in

16   terms of defect, and that includes the --

17             Q     Just to be clear, the only

18   allegation of defect -- strike that.

19                   Just to be clear, the only

20   opinion of defect you have with respect to

21   the air bag system and the 1996 Ford Contour

22   that you're going to come to court and say in

23   this case is the addition of the dwell

24   enhancer, right?

25       A     As I sit here now, that's correct.

G. L. Mahon, P.E.

1          Q     As you sit here today, you

2   can't tell me anything about the other

3   circumstances of the other deer impact tests

4   that you contend are substantially similar?

5        A     That's correct.

6          Q     Have I heard all of your

7   opinions that you're going to give in this

8   case?

9        A     I certainly hope so.

10          Q     Have I heard all of the bases

11   for opinions in this case, your opinions?

12        A     I think so.

13          Q     Do you have any current plans

14   to do additional work in this case?

15        A     That depends on the outcome of the

16   inspection which I will review, and on any

17   testimony given by Ford experts which I will

18   also review.

19          Q     Did anybody at Breed tell you

20   that you could not put in writing your

21   criticisms of the dwell enhancer and send it

22   to Ford?

23        A     You know, Allen Breed might

24   actually have said that, "Don't ever write a

25   nasty letter to Ford."

EXHIBIT C

Mr. Michael Shepston                                         June 8, 2006

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA


Karen Elliott, an individual,                )
                                             )
                        Plaintiff,           )
                                             )
        vs.                                  ) No. CV 2004 0902
                                             ) PHX SRB
Ford Motor Company, a Delaware               )
Corporation, TRW Automotive Holdings,        )
Corp., a Delaware Corporation; and           )
Autoliv Inc., a foreign corporation,         )
                        Defendants.          )
                                             )


THE EXPERT DEPOSITION OF MR. MICHAEL SHEPSTON


Phoenix, Arizona
June 8th, 2006
10:00 a.m.


Prepared for:                      Lori Hetland
THE COURT                          Certified Reporter
                                   License No. #50034

Esquire Deposition Services        2929 North Central Avenue Suite 1680        Phoenix, Arizona 85012
Phone (602) 749-1088                                                           Fax (602) 749-1089

7e0f0eeb-2cf4-4946-b892-4f1b591d6bf0

Mr. Michael Shepston

```
 1          A.    We adjusted the bumper inspection and we
 2   removed the cover on the 26th, and I took laser measurements
 3   for the total station, and I'm having trouble downloading
 4   that in order to analyze that data.
 5               I was not able to provide that data.  I do
 6   not anticipate that changing my opinions based on what I
 7   have seen.
 8          Q.    Is there something you're going to do in the
 9   future to make that happen or for that download to work?
10          A.    I have to because I have other stuff I need
11   to download as well, and I need to collect more data on the
12   other cases, and right now I can't.  I have to figure out
13   what is going on with it, and I have called tech support as
14   well.
15               The total station seems to be fine.  It's a
16   problem I need to get rectified.  I'm trying to get it
17   rectified.
18          Q.    Did you consider anything you observed,
19   measured, or learned at that inspection on June 26th that
20   would affect your final opinions today?
21               MR. SHUMWAY: I think you have the wrong
22   date.
23               MS. GOLDSMITH:  What date was it?  I had
24   May 26th.
25               THE WITNESS:  No.  I absolutely considered
```

Esquire Deposition Services
Phone (602) 749-1088

2929 North Central Avenue Suite 1680

Phoenix, Arizona 85012
Fax (602) 749-1089

7e0f0eeb-2cf4-4946-b892-4f1b591d6bf0

Mr. Michael Shepston

1    it.  Nothing changed my opinions.

2    BY MS. GOLDSMITH:

3         Q.    Okay.  So you actual have considered

4    whatever you observed or measured or inspected on the 26th

5    which was when the bumper cover was taken off the Elliott

6    vehicle.  Correct?

7         A.    Yes.

8         Q.    And based on that inspection your report is

9    no different.  Correct?

10        A.    That would be correct.  There may be some

11   slight differences when I did the simulation.  There were

12   some marks that I saw that I believe were wiped off the

13   bumper cover that I did not see during my inspection that

14   would line up the vehicle, and that changes the alignment a

15   little bit.

16        Q.    How?

17        A.    It moved it over -- moved the Elliott

18   vehicle over to the right a little bit.  We can go through

19   the photographs.

20        Q.    Fair enough.  Going through Exhibit 2, I

21   don't see any indications as to what you have reviewed or

22   received in this case.  Do you have such a list?

23        A.    In my report, and I have basically

24   everything here as far as my report is concerned.

25        Q.    Let's mark your report as Exhibit No. 3.

Esquire Deposition Services          2929 North Central Avenue Suite 1680          Phoenix, Arizona 85012
Phone (602) 749-1088                                                               Fax (602) 749-1089

7e0f0eeb-2cf4-4946-b892-4f1b591d6bf0